UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Richmond Division

**PAULA FAITH BINGMAN**

   *Plaintiff*,

v.

**SOUTH UNIVERSITY OF VIRGINIA, INC.
d/b/a SOUTH UNIVERSITY – RICHMOND**

**Serve: CORPORATION SERVICE COMPANY, R/A**
   **100 Shockoe Slip, 2nd Floor**
   **Richmond, Virginia 23219**
   **Richmond City**

and                         Case No.: 3:18-cv-00476

**EDUCATION MANAGEMENT CORPORATION**

**Serve: Edward H. West, President**
   **210 6th Avenue, 33rd Floor**
   **Pittsburg, PA 15222-2602**
   **Via the Secretary of the Commonwealth**

and

**THE DREAM CENTER FOUNDATION, A
CALIFORNIA NONPROFIT CORPORATION**

**Serve: Thomas Gehring, R/A**
   **1534 17th Street, Suite 203**
   **Santa Monica, CA 90404**
   **Via the Secretary of the Commonwealth**

and

**DREAM CENTER EDUCATION HOLDINGS, LLC**

**Serve: Corporation Service Company**
   **2338 W. Royal Palm Road, Suite J**
   **Phoenix, AZ 85021**
   **Via the Secretary of the Commonwealth**

   *Defendants*.

# COMPLAINT

## Introduction

The plaintiff, Paula Faith Bingman ("Faith") was a pregnant student in the Physical Therapy Assistant Program ("PTA Program") at South University of Virginia, Inc. ("South University"). South University took her $33,330 in tuition payments (all made by student loans) and then made her withdraw from the PTA Program because she was pregnant, with the promise that she could return after her pregnancy was completed. However, South University did not let her return to the program. When Faith's pregnancy was completed, South University refused to readmit her and did not return any tuition payments.

South University's forcing Faith to withdraw from and refusing to readmit her to the PTA Program violated Title IX of the Education Amendments of 1972 and the applicable CFR Title 34 regulations implementing Title IX.

Faith brings this suit for damages for South University's violations of Title IX. She also seeks various Virginia statutory, common law, and equitable remedies.

## Parties

1. Faith is a resident and citizen of the Commonwealth of Virginia. She is a former student at South University.

2. South University is a Virginia corporation in good standing, with a principal place of business at 210 Sixth Avenue, 33rd Floor, Pittsburg, PA.

3. Education Management Corporation ("EDMC") is a Pennsylvania corporation in good standing with a principal place of business at 210 Sixth Avenue, 33rd Floor, Pittsburg, PA. It was the owner of South University when the actions complained of in this Complaint took place.

2

4. The Dream Center Foundation, a California Non-Profit Corporation ("The Dream Center"), is a California corporation in good standing with a principal place of business at 2301 Bellevue Avenue, Los Angeles, CA 90026. It is, on information and belief, the current owner of South University. Faith is unaware of how the transaction in which The Dream Center purchased EDMC allocated between EDMC and The Dream Center any corporate liability incurred by EDMC during its ownership of South University.

5. Dream Center Education Holdings, LLC ("DCEH") is an Arizona Limited Liability Company with its principal place of business at 7135 E. Camelback, Suite F 240, Scottsdale, AZ 85251. Upon information and belief, The Dream Center (which is a member of DCEH) formed DCEH to operate The Dream Center's educational holdings, which include South University. Faith is unaware of how the transaction in which The Dream Center purchased EDMC allocated between EDMC and DCEH any corporate liability incurred by EDMC during its ownership of South University.

## Jurisdiction and Venue

6. Subject matter jurisdiction lies properly in this Court pursuant to 28 U.S.C. §1331 (in that Count I arises under the substantive rights set forth in 20 U.S.C. §1681(a)); *Cannon v. University of Chicago*, 441 U.S. 677 (1979) (establishing a private right of action to enforce 20 U.S.C. §1681(a)); and *Franklin v. Gwinnett County Pub. Sch.*, 503 U.S. 60 (1992) (extending 20 U.S.C. §1681(a)'s private right of action to encompass claims for compensatory damages). This Court has jurisdiction under 28 U.S.C. §1367(a) over the supplemental state law claims raised as Counts II-IV.

7. This Court's subject matter jurisdiction to hear this case concerning a violation of 20 U.S.C. §1681(a) is contingent on South University receiving Federal financial assistance.

"Receiving Federal financial assistance" encompasses enrolling students who receive federally-guaranteed loans to pay their tuition. *Doe v. Marymount University,* Case No. 1:17-cv-401, 2018 U.S. Dist. LEXIS 43164 at *14-15 (E.D. Va. March 14, 2018). Faith received federally guaranteed loans to pay part of her tuition at South University during the period the discriminatory action complained of here took place.

8. A substantial part, if not all, of the events giving rise to Faith's cause of action under 20 U.S.C. §1681(a) took place in the Eastern District of Virginia, so venue is proper in this district pursuant to 28 U.S.C. §1391(b)(2). A substantial part of the events giving rise to Faith's cause of action under 20 U.S.C. §1681(a) took place in Henrico County, so venue is proper in this division pursuant to Local Rule 3(C).

## **Facts**

9. Faith enrolled in South University in the Spring Quarter of 2016 to take her prerequisite courses for the PTA Program.

10. Faith successfully completed her prerequisite courses and began classes in the PTA Program in the Summer Quarter of 2016.

11. Faith's tuition for her courses at South University totaled $33,330.00 for 6 quarters.

12. Faith applied for and received $9,897.00 Federal Direct Subsidized Student Loans and $12,864.00 in Federal Direct Unsubsidized Student Loans, for a total of $22,761 in Federal loans. On information and belief, this federal loan money was paid directly to South University, with Faith being responsible for paying it back.

13. The federal loans left a $10,569 deficit in what she owed South University for tuition. Prior to her enrollment, Faith executed a Retail Installment Contract for Goods and Services with South University to borrow $10,569. **Exhibit A.**

14. The $10,569 financed under **Exhibit A** represented that portion of Faith's $33,330 total PTA Program tuition that was not covered by federal student loans.

15. **Exhibit A** provides that Faith's $10,569 was purchasing "educational goods and services" from South University. As the $10,569 financed under **Exhibit A** was for Faith's personal (as opposed to federal loans) contribution to her ***full tuition*** for the PTA Program (*see* **Exhibit G)**, the "educational goods and services" that Faith was purchasing encompassed the entire course of study for the PTA Program.

16. Faith began classes in the PTA program at South University in June of 2016.

17. Faith was pregnant at the time she enrolled in the PTA Program, and Dr. Tawny Chamberlain ("Chamberlain"), the PTA Program Director for South University, knew that Faith was pregnant when she enrolled in the PTA Program.

18. Before sending her acceptance letter to South University, Faith specifically told Chamberlain that Faith was pregnant.

19. Before sending her acceptance letter to South University, Faith specifically told Chamberlain that Faith's pregnancy due date was in November of 2016, a date that fell after the date that the clinical portion of the PTA Program began.

20. In response, Chamberlain told Faith that the PTA Program administrators and faculty "would work with" Faith to ensure that Faith "could complete the PTA Program" (including participating in clinicals) notwithstanding any accommodations needed for Faith's pregnancy.

21. It was clear to Faith from Chamberlain's reassurances that Faith would have no problem completing the PTA Program, notwithstanding any issues raised by Faith's pregnancy.

22. After Faith enrolled in the PTA Program, Faith had a similar conversation about completing the PTA Program while pregnant with Chamberlain and Dr. Catherine Batten, South University's Dean of Student Affairs, in which conversation Faith was never advised that there would be any problem whatsoever in Faith completing the PTA Program (including participating in clinicals) while pregnant.

23. In or about August of 2016, Chamberlain called Faith into her office for a conference. Martha Selden, the Clinical Director of the PTA Program, was also present at this conference.

24. The clinical part of the PTA Program was scheduled to begin in November of 2016.

25. Chamberlain told Faith that because of a weight-lifting restriction that would be imposed on Faith during her post-operative period following her caesarian section, Faith could not begin the clinical portion of the PTA Program.

26. Chamberlain said that Chamberlain could not "by law" send Faith out to participate in her clinical program if Faith could not lift 50 pounds.

27. In all the discussions that Faith had with Chamberlain both before and after enrolling in the PTA Program, Chamberlain had never mentioned this "50-pound lifting" requirement to Faith. This August meeting came a mere 2 months after Chamberlain had reassured and advised Faith that Faith's pregnancy would present no obstacle to Faith's completing the PTA Program.

28. Chamberlain told Faith that Chamberlain was "not sure how" Faith would be able "to fit the clinical program in" before "the next courses began" in January of 2017.

29. Faith wanted to, and was ready, willing, and able with a reasonable accommodation for her post-pregnancy surgical recovery limitations, to enter and complete the clinical portion of the PTA Program.

30. Based on Faith's several previous discussions with Chamberlain about this very issue, Faith expected South University either to: (a) make a reasonable accommodation for her post-pregnancy recovery so she could take her clinicals as scheduled in November of 2016; or (b) allow her to take a medical leave of absence and return to the PTA Program, to be reinstated at the status she was in when her medical leave began.

31. Chamberlain then asked Faith if she "had any ideas on how to resolve this issue."

32. Faith then asked Chamberlain what Faith's options were.

33. Chamberlain directed Faith to "wait for a year", and then "pick up where [she] left off."

34. Chamberlain stated that Faith could start her PTA Program back up (with the clinical portion of the PTA Program in November of 2017) when the next upcoming class arrived at the clinical portion of its curriculum.

35. Faith took this direction from Chamberlain that Chamberlain was allowing Faith to take a medical leave of absence and return to the PTA Program, to be reinstated at the status she was in when her medical leave began.

36. Neither Chamberlain nor any South University employee offered Faith any accommodations to allow her to complete her clinicals when scheduled nor any additional options to address Faith's delaying taking clinicals considering Faith's pregnancy.

37. Faith understood from Chamberlain's direction that if she should withdraw from South University, then she would not have to reapply for the PTA Program in 2017 – Faith could, instead, "pick up right where she left off" – that is, join the next class at the point in the curriculum where clinicals started, and then complete the curriculum towards graduation.

38. Faith wrote an email, **Exhibit B**, on September 8, 2016 to Catherine Batten, Dean of Student Affairs, in which Faith characterized Faith's understanding of what she and Chamberlain had agreed to. Faith was "taking leave for now and [coming] back next year" and was "withdrawing temporarily" from South University. Clearly, Faith did not ever agree with any representative of South University to withdraw from South University permanently.

39. In accordance with Chamberlain's direction, Faith temporarily withdrew from South University in September of 2016. To Faith's understanding, the withdrawal was temporary until she would be readmitted to pick her studies back up right where she left off.

40. In June of 2017, Faith wrote a reinstatement request letter to the Board of South University, in accordance with what she understood her agreement with Chamberlain to be, asking to be reinstated into the PTA Program.

41. Instead, in response to her reinstatement request, Faith received a letter from Chamberlain. **Exhibit C.** The letter speaks for itself; however, summarizing, the letter indicated that, rather than offering automatic reinstatement at the point in the curriculum where Faith had temporarily suspended her studies, South University had the following requirements for Faith to be reinstated:

a. That Faith take/pass exams for classes in the PTA Program that Faith had already successfully completed prior to her temporarily withdrawing;

b. That Faith pay for obtaining updated background checks, drug testing, immunizations, and CPR certification; and

c. That Faith's readmission was contingent on "a slot" in the program being "available" during the Fall 2017.

42. Chamberlain's letter gave Faith until July 30, 2017 to agree to the reinstatement terms in **Exhibit C.**

43. Shortly before July 30, 2017, Faith called Chamberlain and found out that there were no positions (or "slots") available in the PTA Program headed into the Fall 2017 clinicals. Based on no slots being available, South University was not going to readmit Faith.

44. South University did not reinstate Faith into the PTA Program.

45. Faith paid South University approximately $22,761 via federal student loans (of which Faith has $22,012.79 to pay back) and $10,569 via a private loan (which Faith has repaid in full), for a total paid of approximately $33,330.00 – representing the tuition for the entire 6 quarter course. On information and belief, South University kept this entire $33,330, even though Faith attended only 2 quarters of instruction before South University directed her to leave the PTA Program.

## COUNT I
## Violation of Title IX - 20 U.S.C. §1681(a)

46. Faith realleges ¶¶1-45.

47. 20 U.S.C. §1681(a) provides:

    No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance. . . .

48. 34 CFR §106.40(a) provides:

    A recipient shall not apply any rule concerning a student's actual or potential parental, family, or marital status which treats students differently on the basis of sex.

49. 34 CFR §106.40(b) provides:

    (1) A recipient shall not discriminate against any student, or exclude any student from its education program or activity, including any class or extracurricular activity, on the basis of such student's pregnancy, childbirth, false pregnancy, termination of pregnancy or recovery therefrom, unless the student requests voluntarily to participate in a separate portion of the program or activity of the recipient.

    (2) A recipient may require such a student to obtain the certification of a physician that the student is physically and emotionally able to continue participation so long as such a certification is required of all students for other physical or emotional conditions requiring the attention of a physician.

    . . . .

    (5) In the case of a recipient which does not maintain a leave policy for its students, or in the case of a student who does not otherwise qualify for leave under such a policy, a recipient shall treat pregnancy, childbirth, false pregnancy, termination of pregnancy and recovery therefrom as a justification for a leave of absence for so long a period of time as is deemed medically necessary by the student's physician, at the conclusion of which the student shall be reinstated to the status which she held when the leave began.

50. In telling Faith in or about August of 2016 that she would have to withdraw from the PTA Program for no other reason than that she was pregnant, South University, through Chamberlain and others, violated 20 U.S.C. §1681(a), 34 CFR §106.40(a), and 34 CFR §106.40(b)(1).

51. In telling Faith in or about August of 2016 that she would have to withdraw from the program and then in or about June of 2017 imposing conditions on her return, such that she had to retake tests on courses that she already passed, re-do administrative requirements, and wait for a position in the next class to become available, South University, through Chamberlain, violated 20 U.S.C. §1681(a), 34 CFR §106.40(a), and 34 CFR §106.40(b)(5).

52. In refusing Faith re-entry into the PTA Program without condition in June of 2017, and in refusing to re-instate Faith into the PTA Program in the status which she held when her temporary withdrawal began, South University, through Chamberlain and others, violated 20 U.S.C. §1681(a), 34 CFR §106.40(a), and 34 CFR §106.40(b)(5).

53. In so acting, South University, through Chamberlain and others, acted purposefully and with a callous disregard to Faith's federally protected rights.

## COUNT II
### Violation of The Virginia Consumer Protection Act: Va. Code §59.1-200(A)(14)

54. Faith realleges ¶¶1-53.

55. Va. Code §59.1-200(A)(14) makes it actionable to use any "… deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction."

56. Va. Code §59.1-198 defines a "consumer transaction" as an "offering for sale . . . of . . . services to be used primarily for personal . . . purposes."

57. The transaction by which Faith agreed to become a student at South University, and to pay in full for South's educational services, and by which South University agreed to

provide educational services to Faith, was a consumer transaction under Va. Code §59.1-198. In such transaction, South University explicitly agreed to supply Faith specific education services (*i.e.,* the full PTA Program) in return for her tuition payments.

58. South University, by and through its agents described in Count I *supra*, knew at the time that Faith enrolled in the PTA Program, and at the time the parties contracted for South University to provide Faith the education services in return for Faith's payment of the full tuition, that Faith was pregnant.

59. South University knew at the time that Faith enrolled in the PTA Program that South University was not going to allow Faith to complete the full PTA Program; rather, they were going to make her leave the PTA Program, using her post-pregnancy physical restrictions as the reason and excuse for requiring her to leave, and not allow her back into the program.

60. South University knew at the time it completed the transaction with Faith that South University would force Faith out of the PTA Program and yet still retain her full tuition payment of $33,330, $10,569 of which Faith has fully paid back and the vast majority of the federally financed portion ($22,012.79) she is obligated to repay.

61. South University's representation to Faith, at the time that Faith entered into her contract with South University for education services in return for Faith's tuition payment, that South University would provide Faith the education services comprised of the entire PTA Program curriculum, in response to her full tuition payment, was a deception, fraud, false pretense, false promise, and misrepresentation made during the course of this consumer transaction, which South made knowingly and willfully, because South University had no intention, at the time its representative(s) made that representation, of providing Faith the full education services for which she had contracted.

62. South University retained the full $33,330 of Faith's tuition, forced her to withdraw from the PTA Program after Faith completed only 2 quarters of the program, and then refused to readmit and reinstate her back into the PTA Program.

## COUNT III
## Fraud in the Inducement

63. Faith realleges ¶¶1-62.

64. South University made a false representation to Faith when South University contracted with her to provide education services; *viz.*, that in return for Faith paying the full tuition of $33,330, South University would provide Faith with a full course of study in the PTA Program.

65. The fact that South University would provide Faith with a full course of study in the PTA Program was a material fact in inducing Faith to enter into the contract; in fact, it went to the very essence of the contract.

66. South University made the misrepresentation intentionally and knowingly; *viz.*, South University knew that Faith was pregnant when she entered into the contract for education services, knew that South University was going to use Faith's pregnancy to force Faith to leave the program before she completed it, and nonetheless misrepresented to Faith that South University was going to provide Faith the full course of the PTA Program instruction in return for her full tuition payment.

67. South University made the misrepresentation listed in ¶66 with intent to mislead Faith into thinking that a full course of the PTA Program was available to her, so she would sign the contract for education services.

68. Faith reasonably relied on South University's misrepresentation in signing the education contract and paying her full tuition.

69. Faith was damaged by her reasonable reliance by paying the full $33,330 in tuition and then not being allowed to complete the PTA Program.

## COUNT IV
## Unjust Enrichment

70. Faith realleges ¶¶1-69.

71. Faith conferred a benefit on South University by paying them $33,330 in tuition payments.

72. South University had actual knowledge of Faith's conferring that benefit on them.

73. South University accepted and retained that benefit, in circumstances, described in this Complaint, that render it inequitable for South University to retain the benefit.

WHEREFORE the plaintiff, Paula Faith Bingman, moves this Court for the following relief against all defendants:

74. As to Count I, violation of Title IX:

    A. A judgment against the defendants for $33,330 in compensatory damages.

    B. A judgment against the defendants for $500,000 in punitive damages.[1]

    C. An award of her litigation costs and attorney's fees pursuant to 42 U.S.C. §1988.

---

[1] The plaintiff acknowledges that the 4th Circuit has held that the plaintiff may not recover punitive damages in a Title IX claim; however, it did so in an unpublished opinion. *See Mercer v. Duke Univ.*, 50 Fed. Appx. 643 (4th Cir. 2002), 2002 U.S. App. LEXIS 23610. This unpublished opinion is not binding on this court, and seems to contradict the holding of the United States Supreme Court in *Franklin v. Gwinnett County Pub. Sch.*, 503 U.S. 60 (1992) (where liability was created by statute without defining or limiting any remedy, all remedies available in a common law action would be appropriate). Imposing punitive damages is a common law remedy. Thus, the plaintiff is making a good faith argument that the law related to punitive damages for Title IX cases in the 4th Circuit is technically, given the unpublished status of *Mercer,* an open question.

75. As to Count II, violation of the VCPA:

    A. A judgment against the defendants for $33,330 in compensatory damages, trebled to $99,990 in accordance with Va. Code §59.1-204(A), due to South University's willful and knowing violation of the VCPA.

    B. An award of her litigation costs and attorney's fees pursuant to Va. Code §59.1-204(B).

76. As to Count III, fraud in the inducement:

    A. A judgment against the defendants for $33,330, representing a return of Faith's tuition payments made under the contract for services. *George Robberecht Seafood, Inc. v. Maitland Bros. Co.*, 220 Va. 109, 255 S.E.2d 682 (1979) (fraud in the inducement of a contract will support an action in equity to rescind the contract or an action at law to recover damages).

    B. A judgment against the defendants for $350,000 in punitive damages.

    C. An award of her litigation costs and attorney's fees pursuant to *Prospect Dev. Co. v. Bershader*, 258 Va. 75, 515 S.E.2d 291 (1999) (a plaintiff may recover her costs and attorney's fees if she proves fraud on the part of the defendant).

77. As to Count IV, Unjust Enrichment:

    A. A judgment against the defendants for $33,330, representing a return of Faith's tuition payments made under the contract for services.

    B. Recovery of her litigation costs.

78. The plaintiff demands a trial by jury on all counts of this Complaint so triable.

**PAULA FAITH BINGMAN**


By: /s/ Michael L. Donner, Sr.
       Of Counsel


Michael L. Donner, Sr., Esq. (VSB No. 40958)
Setliff Law, P.C.
4940 Dominion Boulevard
Glen Allen, VA 23060
(804) 377-1260 (main number)
(804) 377-1280 (facsimile)
mdonner@setlifflaw.com
    *Counsel for Plaintiff*